**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TABATHA KNIGHT ) | |
| 12704 Lusby Ln. ) | |
| Brandywine, MD 20613 ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | Civil Action No. |
| vs. ) | |
| ) | |
| DISTRICT OF COLUMBIA ) | |
| MURIEL BOWSER, MAYOR ) | **Jury Demanded** |
| 1350 Pennsylvania Avenue, NW ) | |
| Washington, DC 20001 ) | |
| ) | |
| Serve:  DC Attorney General ) | |
|            Carl Racine, or his designed ) | |
|            Representative ) | |
|            441 – 4th Street, N.W. ) | |
|            Washington, DC 20001 ) | |
| ) | |
| *Defendant*. ) | |
| _____ ) | |

**COMPLAINT**

**COMES NOW**, the Plaintiff Tabatha Knight, by and through undersigned counsel, with

her COMPLAINT against Defendant the District of Columbia (hereinafter "DC" or "Defendant")

for the causes of action stated below:

**PARTIES**

1.      Plaintiff Tabatha Knight ("Plaintiff" or "Ms. Knight") was an employee of the District of

Columbia Metropolitan Police Department (hereinafter "MPD").  She began her employment with

MPD as a civilian employee in 1989, and became a sworn officer in 1991.  She retired from the

MPD on or about March 24, 2021.  She is a resident of the State of Maryland.

2.      Defendant District of Columbia is a municipality governed by Mayor Muriel Bowser and the City Counsel of the District of Columbia.

3.      The DC Metropolitan Police Department is a law enforcement agency and department of the District of Columbia Government.

## JURISDICTION

4.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as it asserts claims that arise under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* ('Title VII"), District of Columbia Human Rights Act, District of Columbia Code § 2-1401.01 *et seq.*, The Civil Rights Act of 1866, 42 U.S.C. § 1981(a), 42 U.S.C. 1981 by way and through 42 U.S.C. § 1983, and the District of Columbia Whistleblower Protection Act, District of Columbia Code § 1-615-51, *et seq.*  This Court also has jurisdiction over Plaintiff's tort claims against the District of Columbia.

## VENUE

5.      Venue is proper in the District of Columbia under 28 U.S.C. § 1331 and 29 U.S.C. § 1402 substantially all the acts and omissions that give rise to this complaint occurred in the District of Columbia.  Further, this Court has jurisdiction over this Complaint because there is diversity of the parties, and a question of federal law is presented.  28 U.S.C. §§ 1331 (federal question) and 1332 (diversity).  Venue properly lies within this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

## EXHAUSTION OF REMEDIES

6.      Plaintiff has exhausted all administrative remedies.

7.      On or about May 20, 2021, Plaintiff timely filed a formal Charge of Discrimination (No. 570-2021-00623) with the U.S. Equal Employment Opportunity Commission ("EEOC") for discrimination based on race (African American), sex (female), disability and retaliation for prior and ongoing EEO activity, her claims being based on disparate treatment and the creation of a hostile work environment.

8.      On or about May 24, 2021, the EEOC issued a Dismissal and Notice of Right to Sue, giving Plaintiff ninety (90) days to file a civil action.

9.      Plaintiff now timely files this action pursuant to federal law.

## RELEVANT FACTS COMMON TO ALL CLAIMS

10.     Plaintiff Knight began her employment with the MPD in 1989, when she was hired for a civilian position.  In 1991, she transferred to a sworn officer position and was assigned to the 4th District.

11.     While Plaintiff was still a rookie and in training, Sgt. Braum Persaud (hereinafter "Sgt. Persaud") began sexually harassing her by making inappropriate and suggestive comments.

12.     Plaintiff complained of Sgt. Persaud's inappropriate, intimidating and unwanted to her supervisor, but nothing was done.

13.     Eventually, Sgt. Persaud went so far to call Plaintiff's grandmother's house on Plaintiff's day off. When Plaintiff returned the call, which was very unusual, Sgt. Persaud asked her to meet him for a sexual assignation.

14.     When Plaintiff refused, and explained that she was married, Sgt. Persaud's demeanor towards Plaintiff completely changed.

3

15.     Sgt. Persaud retaliated against Plaintiff for refusing his advances by giving her very undesirable assignments, such as a walking beat that was only one block long, and forbade other officers to help or relieve Plaintiff, making it clear to Plaintiff and to everyone else on the team that she was his target and that no one was to help her.

16.     At times, Sgt. Persaud's retaliation and mistreatment of Plaintiff left her with no back-up or assistance in part of the city with active gang violence, which put her personal safety at risk.

17.     In 1993, Plaintiff again informed her superior Commander Bill Sarvis that she was being sexually harassed and retaliated against by Sgt. Persaud.

18.     Instead of investigating or disciplining Sgt. Persaud, Defendant made Plaintiff switch Districts with another female officer, Carolyn Battle, and moved Plaintiff to the First District.

19.     On Plaintiff's first day in her new district, Captain Michael Razalowski (hereinafter "Capt. Razalowski"), the leader of the First District substation called Plaintiff into his office and proceeded to scream and curse at her, calling her a "trouble-maker."

20.     From that day on, the First District Station Sergeants, Phillip Parker (hereinafter "Sgt. Parker") and Richard Gets (hereinafter "Sgt. Gets"), harassed, attacked, bullied, demeaned, isolated and undermined Plaintiff on a near-daily basis.

21.     The systematic, and management-approved retaliation against Plaintiff continued unabated until Cpt. Razalowski was replaced by Captain Charles Fonville (hereinafter "Cpt. Fonville").   Cpt. Fonville put a stop to the harassment and retaliation, but he did not discipline the Sgts  who had engaged in it.

22.     Plaintiff remained in the Fist District until 1997, when she was swapped out with another officer from the Fifth District.

23.     In 2001, Plaintiff was again transferred, this time to the training academy as an instructor, where she remained until 2009.

24.     In 2009, Plaintiff was assigned to the District 5 administrative office with Sergeant Randy Griffin (hereinafter "Sgt. Griffin").

25.     Sgt. Griffin was not happy with Plaintiff being assigned under him because he felt an officer who was working well in the roll was moved out of admin to make room for Plaintiff.

26.     Sgt. Griffin was thus hostile and unprofessional towards Plaintiff from the beginning of her assignment.

27.     Sgt. Griffin wrote-up Plaintiff for three separate disciplinary infractions, and rather than provide them to her in a professional manner, he placed them in her jacket.  When Plaintiff discovered them, she went directly to the department Captain to address the situation.

28.     The department Captain, Lewis Douglas, removed the disciplinary actions.  No action or discipline was taken against Sgt. Griffin for abuse of his power and fraudulent disciplinary actions.

29.     To further retaliate against and bully Plaintiff, Sgt. Griffin ordered Plaintiff to report to the Police and Fire Clinic for a fitness for duty evaluation. Sgt. Griffin claimed that the basis for the referral was that Plaintiff had informed him that she was "depressed."  Plaintiff had not done so.

30.     Plaintiff complained to the department commander that what Sgt. Griffin had done was wrong and retaliatory, and she was informed by Capt. Douglas to disregard the referral.

31.     Plaintiff was moved from the part of the office where she worked for Sgt. Griffin and placed under the department commander. Sgt Griffin was removed from the administrative office. Shortly thereafter Plaintiff was transferred to SOD.

32.     Plaintiff served in SOD from 2009 to March of 2014.

33.     In March of 2014, Plaintiff was sent back to the Fifth District from SOD. Plaintiff was confused by the transfer because there didn't appear to be a reason for it.

34.     Plaintiff contacted Chief Lamar Green (hereinafter "Chief Green"), to find out why she had been transferred.  He investigated and informed Plaintiff that the order came from Chief Cathy Lanier (hereinafter "Chief Lanier") who was incensed about some incident that purportedly involved Plaintiff.  Notably, Plaintiff was punitively transferred before she was even informed or asked about the incident.

35.     Plaintiff was order to the Internal Affairs Department (hereinafter "IAD") to be interviewed by Sergeant Brad Wagner (hereinafter "Sgt. Wagner").

36.     Plaintiff attended the meeting with her husband, Fred Knight (hereinafter "Mr. Knight"). IAD told Mr. Knight he couldn't sit in on the interview because he was a potential witness.

37.     In the interview, Plaintiff was played a tape recording of a message left by a female voice that stated: "Hey Fred your wife is not at work.  She is having an affair with Captain Shelton, and she is with him right now."

38.     At first, Plaintiff thought she was called in to IAD to be accused of having an affair with Captain Shelton, which she vehemently denied.   She soon discovered that she was being accused of having made the call to a different "Fred," the husband of Officer Janice Oliver.

39.     Mr. Knight was taken into a separate room where IAD played him the tape to see if he could identify the voice as Plaintiff's.  Essentially, IAD was trying to enlist Mr. Knight as a witness against his wife.   Mr. Knight made clear that the voice was not Plaintiff's.

40.     Plaintiff immediately offered IAD her phone records to prove that she was not the person who made the call at issue.  She also offered to take a polygraph and for a voice recognition expert to be used to prove that the voice on the recording was not hers.

41.     Plaintiff passed the polygraph exam, but Chief Lanier would not accept that she was innocent, despite the fact that Plaintiff's phone records also proved she did not make the call, and was on patrol when the call was made.

42.     The MPD refused to pay for the voice recognition expert, so Plaintiff paid for it herself to prove her innocence.  She took the voice recognition test in the presence of IAD to ensure that they could not question the validity of the test.

43.     The voice recognition expert concluded that the voice on the message was **not** Plaintiff's voice.

44.     Sgt. Wager informed Chief Lanier that Plaintiff was innocent, but Chief Lanier did not care.  She refused to reverse Plaintiff's punitive transfer out of SOD.

45.     Plaintiff met with Chief Alfred Durham (hereinafter "Chief Durham") to complain about the unfair way she was being treated.  Chief Durham stated that Plaintiff would not be reinstated to SOD despite

having passed all the tests proving her innocence, because Officer Olive still "believed" that Plaintiff had made the call.

46.    Chief Lanier chose to appease Officer Olive at Plaintiff's expense because Chief Lanier and Officer Olive were close friends.

47.    Plaintiff escalated matters by reaching out to Mayor Bowser's office.  An aid in the Mayor's office informed Plaintiff that her complaint would be investigated by the Office of the Inspector General (hereinafter "OIG").

48.    In December of 2014, nearly a *year later*, OIG called Plaintiff to ascertain if she had been transferred back to SOD.  She stated that she had not.

49.    Two weeks later, Plaintiff was transferred back to SOD.

50.    Eventually, Officer Olive was fired for making false statements about having an affair. Capitan Shelton only received a letter of prejudice after making false statements, and for going to Maryland to engage in an illicit affair while on the clock. A few months later, he was arrested for DUI. He suffered no additional disciplinary action

51.    Chief Lanier was not disciplined for abusing of her power or for retaliating against Plaintiff.

52.    Officers in SOD were received scheduled overtime because of the staffing needs.  When Plaintiff was reinstated to SOD, she was not given back pay for the overtime pay amount she had been wrongfully denied.

53.    During Plaintiff's absence from SOD, the leadership of the department had changed.  When she returned, the SOD Lieutenant was Guillermo Rivera (hereinafter "Lt. Rivera") and the Captain was Jeffrey Carroll (hereinafter "Cpt. Carroll).

54.    Lt. Rivera immediately began to disparage and retaliate against Plaintiff, subjected her to far more restrictive work rules and procedures than her colleagues, and repeatedly accused her of things she had not done, or repeated disparaging rumors about her.

55.    Plaintiff went to her supervisor Sgt. Jane Barrientos (hereinafter "Sgt. Barrientos) to complain about the way she was being treated, and asked that Sgt. Barrientos go with her to talk to Lt. Rivera about

his constant disparaging comments about her.  Lt. Rivera was dismissive and disrespectful during the meeting, refusing to change his inappropriate behavior.

56.     The incessant bullying and disparagement from Lt. Rivera and others in SOD took its toll on Plaintiff, causing her extreme stress and anxiety.

57.     When a position on the Crash Review Board (hereinafter "CRB") was posted as open, Plaintiff leapt at the opportunity.

58.     Plaintiff emailed Commander Stephen Sund (hereinafter Cdr. Sund) to inquire about the position, and was immediately told "no," without any explanation.

59.     A few days later, Cdr. Sund emailed Plaintiff indicating that he would allow her to take the assignment.

60.     But upon her arrival, she was informed that Cpt. Carroll would not allow Plaintiff to be placed in the CRB office, but would have to be moved into the Administrative Office so she "could be watched." This was yet another instance of disparate treatment Plaintiff endured.

61.     Plaintiff complained to Cdr. Sund by email about the way she was being treated differently than others, and unfairly singled-out for supervisory scrutiny.

62.     Eventually Cdr. Sund allowed Plaintiff to work in the CRB office she was assigned to, but made sure she was aware that it was a trial assignment, to undermine her confidence and comfort in the position.

63.     In October of 2015, a letter from the OIG's office acknowledging receipt of Plaintiff's complaint regarding the unfair and retaliatory transfer out of SOD, but that the OIG office considered the matter closed once she was transferred back to SOD.

64.     Plaintiff attempted to contact Daniel Lucas (hereinafter "Mr. Lucas") in the OIG's office to inform him that she felt she was still being retaliated against, and to seek accountability for those who had falsely accused her.

65.     Mr. Lucas did not acknowledge or respond to either Plaintiff's phone calls or her emails to him.

66.     Four months later, in February 2016, Plaintiff was informed that she was being moved from the supervisory control of Sgt. Barrientos to that of Sgt. Terry Thorne (white male), who sat in a different

building.   The explanation that was given for the change was that CRB, which investigated vehicle accidents, was "somewhat like traffic," so Plaintiff needed to be under the Traffic Department.

67.     In reality, this was another act of retaliation, removing Plaintiff from the supervision of a female Sergeant whom Plaintiff was comfortable working for, to a white male Sergeant who later undertook a scheme to push her out of MPD.

68.     On information and belief, this move was orchestrated by Chief Lanier to retaliate against Plaintiff going to OIG with a complaint about the unfair reassignment from SOD.

69.     Due to some promotions in the Spring of 2016, Plaintiff reported to Cpt. Robert Glover (hereinafter "Cpt. Glover").

70.     Cpt. Glover was openly rude and hostile to Plaintiff from the beginning of her tenure working under him.

71.     Cpt. Glover's animus towards Plaintiff is demonstrated in an incident in June of 2016 in which Plaintiff was directed by Cdr. Carroll to send an overdue car accident case list to the Professional Development Bureau (hereinafter "PDB").  Plaintiff complied with the directive by sending an email to the administrative inbox of the PDB.

72.     Lieutenant James Brown (hereinafter "Lt. Brown") called Plaintiff to ask why she was inquiring about cases that were more than a year old.  She informed him that she had been directed to do so by Cdr. Carroll.

73.     Plaintiff later was informed that Lt. Brown complained to Cpt. Glover about Plaintiff, and accused Plaintiff of sending him a nasty and unprofessional email.

74.     Cpt. Glover became irate at Plaintiff, without asking her anything about the exchange, and insisted that an investigation be launched into her actions.  He further asserted that Plaintiff needed "to be watched."

75.     Plaintiff sent an email to her entire chain of command, attaching the email at issue, and defending her actions.  She asked the team to conduct a thorough investigation, and to hold Lt. Brown accountable if his accusation proved to be unfounded.

76.     Cdr. Carroll ultimately concluded that Plaintiff had done nothing wrong.  No disciplinary action was taken against Lt. Brown for the false accusation, or for Cdr. Glover's ill-conceived and unjustified overreaction.

77.     In response, and as a further act of retaliation, Cdr. Glover went to the Time and Attendance and asked Officers Eric Coates and James Jaffe to hyper-scrutinize Plaintiff's time entries, accusing Plaintiff of "egregious" abuse and theft of paid time (a very serious offense).

78.     Upon being informed that Cdr. Glover had, without any basis in fact, accused Plaintiff of stealing time, Plaintiff had to again involve Cdr. Carroll.

79.     When Plaintiff went to Cdr. Carroll's office and tried to explain how she was being targeted for personal retribution and attack by Cpt. Glover, Cdr. Carroll dismissed her concerns, and all but ignored her, responding that Plaintiff just had "a problem with everyone."

80.     Cdr. Carroll did not take Plaintiff's allegations seriously, and did not feel that it was his responsibility to address and remedy the animus, disparate treatment, and false accusations made by Cpt. Glover.

81.     Cdr. Carroll further admonished Plaintiff because her email to the PDB admin inbox embarrassed Lt. Brown, even if it was sent at Cdr. Carroll's instruction, and in no way was addressed specifically to Lt. Brown.  When Cdr. Carroll made clear that he was not going to do anything to address the unfair and disparate treatment that Plaintiff was enduring, she informed him that she was going to speak to Chief Green.

82.     When Cdr. Carroll asked Plaintiff what she expected Chief Green to do, she informed him that she expected both of them to put a stop to Cpt. Glover's campaign of harassment, and false accusations. Plaintiff left the meeting with Cdr. Carroll feeling defeated, having been informed by her senior manager that he did not believe it was his obligation to ensure that Plaintiff had a fair and non-discriminatory work environment.

83.     When she got back to her desk, Plaintiff sent Cdr. Carroll the email that Cdr. Carroll had claimed "embarrassed" Lt. Brown, just to make a record of what it was that had caused to the fury and backlash.

84.     On or about June 16, 2016, Cdr. Carroll sent a responsive email confirming that Plaintiff had not done anything wrong and stated that he would speak with Cpt. Glover.

85.     In 2017, Plaintiff became an active union representative, and Cdr. Carroll was promoted to be Bureau Chief of the Homeland Security Department (hereinafter "HSB").   Cpt. Glover became the Administrative Captain for SOD, which fell under HSB, and Cpt. Rivera was promoted to Commander of SOD.

86.     As union representative, Plaintiff started to receive complaints from fellow officers about the way Cpt. Glover was treating people.  She passed on their concerns and complaints to Cdr. Rivera.

87.     In 2018, Plaintiff again became the target of a campaign of harassment and disparate treatment. This was manifested by hyper-scrutiny of her work assignments, and changing Plaintiff's assignments without informing her, to cause confusion and chaos in her work schedule.

88.     Plaintiff was so disdained by her leadership that one of them, Lt. Darian Jones (hereinafter "Lt. Jones"), took to pretending that he was mistaking Plaintiff for Sgt. Boyd, a large African American male officer with a full beard.  It was a thinly veiled attempt to denigrate and disparage Plaintiff's appearance that Lt. Jones engaged in on several occasions.

89.     When Plaintiff complained to Cdr. Rivera about the blatant animosity and disrespect from Lt. Jones, Cdr. Rivera dismissed her concern, claiming that Lt. Jones had a right to "inquire about resources."

90.     Lt. Jones had such hostility to Plaintiff that chastised a subordinate Sgt. Keith Jackson (hereinafter "Sgt. Jackson"), for giving Plaintiff an overtime opportunity, and made clear that he did not want Plaintiff assigned to special events. Sgt Jackson also received a call from Lt. Andrew Margiotta (hereinafter "Lt. Margiotta"), the Lieutenant over the Events Section, demanding to know why Plaintiff was working in Special Events.

91.     Sgt. Jackson later informed Plaintiff that she was "hot," a term used in MPD to refer to officers who are unwelcome and targeted for bullying and retaliation.  He told Plaintiff that because Lt. Jones did not like her, he could no longer assign Plaintiff to overtime for the Special Events department, thus isolating her, retaliating against her, and making her subject to disparate treatment and a hostile work environment.

92.     After this, and several other incidents that made clear that Plaintiff was being targeted for bullying and retaliation, on or about March 23, 2019, Plaintiff sent an email to Chief Newsom requesting to speak to him about her hostile work environment.

93.     Approximately a week later, Cdr. Rivera sent an email to the entire department stating that the EEO team would be addressing the department on EEO policy.

94.     In June of 2019, tensions with Cpt. Glover escalated again.  Plaintiff was part of a team tasked with formulating a Memorial Day Schedule for 2020.  Cpt. Glover was combative and hostile during the entire meeting, and during the meeting, decided he was going to conduct a separate meeting with his "Admin" team.   Plaintiff believed that she was part of the "Admin" team.

95.     Cpt. Glover adjourned the meeting, and Plaintiff left to go back to work. On her way, she ran into one of the attendees who informed Plaintiff that Cpt. Glover was conducting a meeting with everyone, but Plaintiff.

96.     When Plaintiff knocked on the door to enter, Cpt. Glover opened the door, told Plaintiff she wasn't invited, and slammed the door in her face.  This act was in violation of Department policy on professionalism.

97.     Furthermore, Cpt. Glover informed the people in the meeting that they were no longer to share information with Plaintiff, and to change all the passwords and codes to all systems so that Plaintiff could use them to do her job. He also informed the team not to ask Plaintiff for any assistance.

98.     Plaintiff requested a meeting with Cdr. Rivera, who immediately took Cpt. Glover's side and refused to address the blatant disrespect and inappropriate behavior of Cpt. Glover.

99.     Eventually, Plaintiff met with Chief Carroll because her management team refused to take seriously or address the daily disparate and hostile treatment that Plaintiff was being subjected to.  Plaintiff further informed Chief Carroll that the racism, sexism and retaliation she was being subjected to was also being visited upon other Black women officers.

100.    Rather than address the issue with his management team, Chief Newsham asked Alphonso Lee of EEO to reach out to Plaintiff to listen to her "concerns."  But instead of actually listening to, or trying to

address, any of Plaintiff's concerns and claims, Mr. Lee gave Plaintiff information on getting EEO "counseling," and let her know that she had a right to file a complaint with the District of Columbia Office of Human Rights (hereinafter "OHR").

101.     On or about October 1, 2019, Plaintiff went to the Deputy Mayor's office and met with Daisha Winham (hereinafter "Ms. Winham") to report her concerns about discrimination withing MPD. Plaintiff informed Ms. Winham of her concerns regarding racial inequality, retaliation and unfair working conditions, provided Ms. Winham with a written summary of Plaintiff's concerns.

102.     Plaintiff was deliberate in informing Ms. Winham of Plaintiff's fears and concerns about retaliation she would suffer for speaking out.  Specifically, Plaintiff mentioned that she had concerns with the Chief Manlapaz of the Internal Affairs Division, who had made it known that he "intended" to retaliate against Plaintiff.

103.     Plaintiff never heard anything back from the deputy Mayor's office.

104.     Undeterred, Plaintiff then went to Councilman Charles Allen's (hereinafter "Councilmember Allen") office requesting to see him.  Plaintiff was instructed to send Councilmember Allen an email, which Plaintiff did. Plaintiff did not receive a response from the Councilmember's Office.

105.     On or about October 14, 2019, Plaintiff spoke with Alana Sisnett (hereinafter Ms. Sisnett) from Mayors Bowsers office. Plaintiff spoke with Ms. Sisnett about racial inequality in the promotional and hiring process, the practice of some in the MPD of falsifying crime statistics, and the fact that MPD EEO appeared to be working on behalf of management, and to the detriment of, and against complainants.

106.     Plaintiff further asserted that Black women officers were not receiving fair and impartial investigations, and further informed Ms. Sisnett that IAD Chief Manlapaz was making it known about he planned to retaliate against Plaintiff for complaining outside the chain of command.

107.     On or about October 18, 2019, Chief Manlapaz cornered union representative Hiram Rivera (hereinafter "Officer Rivera), interrogating him about Plaintiff and her activities. Officer Rivera reported back to Plaintiff that Chief Manlapaz was on the  warpath for her.

108.    Later that day, Plaintiff was told that she was under investigation because there were two cases that she worked on "missing" from the MPD car accident filing system.

109.    Plaintiff was given a question & answer form her commander, and told that she needed to send a spreadsheet of her cases to Chief Manlapaz.  Plaintiff asserts that Chief Manlapaz was making good on his promise and threat to retaliate against Plaintiff for complaining about racial and gender discrimination at the MPD.

110.    Plaintiff later learned that certain files and hard copy and memos had disappeared from the files she worked on, for which she was disciplined, even though no evidence was presented that she was responsible for removing the missing records.

111.    Plaintiff asserts that the files were sabotaged to implicate her as part of a scheme to retaliate against her for complaining about race and gender discrimination.

112.    During Plaintiff's appeal of the discipline she received, it was discovered and noted that Cdr. Rivera had removed important information from the investigation that was favorable toward Plaintiff.

113.    Lt. Walter Flemins, who investigated the case, had requested that the case against Plaintiff be dropped, but Chiefs Carrol and Manlapaz denied the request.

114.    Plaintiff asserts that Chiefs Carrol and Manlapaz denied the request to drop the investigation against Plaintiff because they were seeking a reason to terminate her employment, and to retaliate against her for engaging in protected activity.

115.    During the ordinary course of her work, Plaintiff received a performance evaluation completed by her direct supervisor, Sgt. Barrientos.  That performance evaluation, written by the person who directly observed Plaintiff's performance, gave Plaintiff the highest possible rating of a five (5).

116.    On or about November 27, 2019, Cdr. Rivera informed Sgt. Barrientos that she was no longer going to supervise Plaintiff, and Cdr. Rivera deleted Plaintiff's completed performance evaluation, substituting it with one that he wrote himself.

117.    Cdr. Rivera dropped Plaintiff's performance score from a five (5), which was consistent with Plaintiff's rating for the previous ten (10) years, to a three (3).  The purported justification for the drop in

rating was the fact that Plaintiff was the subject of an investigation initiated by Chief Manlapaz. No other significant performance deficiency was identified to justify the uncharacteristically low rating.

118.     In December of 2019, Plaintiff had an interview with the OHR to discuss her concerns about racial and gender discrimination at the MPD, and the systemic culture of retaliation she had been subjected to. Plaintiff met with Joy Board (hereinafter "Ms. Board").

119.     Plaintiff provided Ms. Board with a written copy of her EEOC complaint against MPD that included racial inequality, favoritism and unfair working conditions. Ms. Board told Plaintiff that MPD was past the allotted time for providing her with an Exit Letter. Plaintiff responded that the Exit Letter had nothing to do with her complaint.

120.     Ms. Board informed Plaintiff that Mr. Lee knew that OHR was only going to investigate what was in the Exit Letter.  Plaintiff started to get upset because once again, her serious concerns and complaints were being brushed off as irrelevant.

121.     To placate Plaintiff, Ms. Board agreed to go through the process anyway.

122.     On or about March 18, 2020, Plaintiff received a DocuSign from Ms. Board. The document addressed an overtime issue concerning Officer Wells and Cdr. Glover, but none of the racial inequality, favoritism and unfair treatment complaints raised by Plaintiff.

123.     On or about March 19, 2020, Plaintiff sent an email to Ms. Board informing her the bases of her complaint were not addressed. Plaintiff informed Ms. Board that the write-up, which only covered an overtime issue, did not address Plaintiff's concerns, and that Plaintiff would therefore not sign it.

124.     Thereafter, OHR issued a letter conveying OHR's Administrative Dismissal of the complaint, despite the fact that it failed to even acknowledge, let alone actually investigate, any of the claims Plaintiff raised in her complaint.

125.     OHR further indicated that Plaintiff's complaint was untimely and lacked any merit. Plaintiff's response was sent to OHR the day after she received their correspondence in the mail.  It was in no way untimely.

126.     On or about January 16, 2020, Plaintiff testified under oath before Councilmember Allen regarding the pattern of falsification of police reports, racial inequalities, and unfair hiring and testing practices at the MPD.

127.     Plaintiff asserted to Councilmember Allen that if MPD leadership didn't do more to promote minorities within the next ten (10) years, there would be no minorities at the top levels of MPD.

128.     Councilmember Allen specifically asked if Plaintiff was being retaliated against. Plaintiff stated that she was. She recounted to Councilmember Allen that she was being retaliated against by Chief Manlapaz of IAD.

129.     Councilmember Allen stated that he would get back to Plaintiff, but and he never did.

130.     In furtherance of the scheme to retaliate against Plaintiff, she was written up twice in February of 2020 for fabricated transgressions.

131.     On or about April 22, 2020, Plaintiff received a phone call from IAD agent Michael Ames (hereinafter "Agent Ames"), informing her that she was the target of yet another "investigation."

132.     Plaintiff immediately told Agent Ames about Chief Manlapaz informing people within the MPD that he intended to retaliate against Plaintiff, and that he was gunning for her.  Plaintiff put Agent Ames on notice that there was legitimate reason to believe the investigation was a contrived, and was an act of retaliation.

133.     Agent Ames told Plaintiff that the investigation was about an email she sent to OHR, and more specifically, that the Plaintiff had mentioned that she had recorded Commander Rivera in that email.

134.     Information that complainants provide to OHR is supposed to remain confidential.

135.     Plaintiff was interview nine (9) times about the alleged recording, but not a single time about the content and substance of her OHR complaint.

136.     As a result of the investigation, Plaintiff was informed that she was going to be suspended for twenty-eight (28) days.  At the time, there was no MPD policy against recording conversations.

137.     It is not a violation of Washington DC law to record a conversation without the prior consent of the person recorded.

16

138.    On or about April 30, 2020, Plaintiff sent an email to Chief Newsham detailing the things that were happening to her.  She implored Chief Newsham to pay attention and act on the discrimination, disparate treatment, and contrived and intentional retaliation and bullying that was taking place at MPD.  Plaintiff received no response from Chief Newsham.

139.    Through her union representative, Officer Rosario, Plaintiff filed a grievance with respect to the suspension, and the union demanded arbitration of the suspension.  The union is not required to demand arbitration on all grievances, but it did choose to pursue this one.

140.    On or about June 4, 2020, Plaintiff informed the MPD Director of Human Resources Angela Simpson, that she was being retaliated against.

141.    On or about July 6, 2020, Plaintiff was ordered back to IAD to speak with agent was David Chumbley (hereinafter "Agent Chumbley"). She appeared at the interview with her union representative, Officer Rosario. Agent Chumbley was so hostile and aggressive in the interview that Officer Rosario stepped in and stopped the interview and asked for another IAD official to intercede.

142.    Approximately a month later, Plaintiff was ordered back to IAD for another interview, but given the hostile and unproductive comportment of Agent Chumbley, Plaintiff was interviewed this time by Captain Pamela Wheeler (hereinafter "Cpt. Wheeler").

143.    Captain Wheeler asked questions about Plaintiff's testimony before the city council. However, Captain Wheeler also tried to convince Plaintiff that she was not being retaliated against as a result of that testimony because the investigation and disciplinary action against her began before the city council testimony occurred.  Plaintiff informed Captain Wheeler that the investigation and discipline was a result of multiple complaints against Chief Manlapaz and others, but escalated after the city council testimony.

144.    On or about September 24, 2020, Plaintiff received a memo from Chief Newsham in response to her appeal of the 28 days suspension, stating that Plaintiff failed to be forthright during the investigation into her recording of Cdr. Rivera.  Chief Newsham's memo did not mention any of the claims and concerns Plaintiff raised to Chief Newsham, and did not address that no evidence against Plaintiff was discovered in the investigation.  It further failed to state why recording Cdr. Rivera would be a violation of MPD policy.

145.    Nevertheless, Plaintiff's suspension was rescinded, and she instead received a letter of censure. Plaintiff sought to go back to SOD, her original department.

146.    On or about February 17, 2021, Chief Chanel Dickerson (hereinafter "Chief Dickerson") told Plaintiff to complete a transfer form to go back to her assignment at SOD. At the time, Plaintiff was temporarily assigned to Chief Dickerson's office for a project, but by then, the project was complete.

147.    Three days later, on or about February 20, 2021, Chief Dickerson called Plaintiff to inform her that Chief Contee refused to allow Plaintiff to go back to SOD, and that Chief Contee wasn't going to require that any other department receive Plaintiff.

148.    This was a direct and intentional denial of job and promotional opportunities to Plaintiff by Chief Contee, as well as act that would negatively affect Plaintiff's pay.  Plaintiff viewed this as an act of retaliation and a negative employment action to punish her for her protected activity.

149.    Because Plaintiff's only option at that point was to go back to patrol, she feared that any further retaliation would result in loss of her job because there would be nowhere else for her to go.

150.    Given that no entity in the District of Columbia was willing to take her claims and concerns seriously, and that no member of MPD leadership was willing to restrain the rampant and intentional retaliation against Plaintiff, Plaintiff opted to retire from the MPD on or about March 24, 2021.

## CAUSES OF ACTION

### Claims Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and Under the District of Columbia Human Rights Act District of Columbia Code § 2-1401.01 *et seq.* (Employment Discrimination on the Basis of Race)

### COUNT I – Disparate Treatment on the Basis of Race

151.    Plaintiff restates and incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

152.    Plaintiff is African American, and as such, is a member of a protected class.

153.    Plaintiff was treated differently and subjected to disparate and more harsh treatment in comparison to similarly situated non-African American police officers.

154.    Plaintiff was disciplined for minor violations for which other non-African American Officers were not disciplined.

155.    Plaintiff was denied job and promotional opportunities that she was qualified for and had earned because of her race.

156.    Plaintiff's legitimate concerns were regularly ignored and dismissed.  The disregard of her concerns, and the punishment handed down to her were fundamentally unjust, and were given to Plaintiff because of her race.

157.    Plaintiff's performance evaluations were based on false and illegitimate disciplinary actions and were pretext to discriminate against Plaintiff on the basis of race.

158.    Plaintiff was treated differently and subjected to different and more harsh terms and conditions of her employment due to her race.

159.    Similarly situated officers who were not Black, were treated more favorably than Plaintiff in the terms and conditions of employment.

160.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race.

161.    As a direct and proximate cause of Defendant's conduct, Plaintiff suffered, and continues to suffer mental and physical injury, and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, and expenses, and costs – and is entitled to all available legal and equitable remedies.

162.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

163.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

164.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## COUNT II – Hostile Work Environment on the Basis of Race

165.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

166.    Defendant has fostered and permitted to flourish a work climate and culture that is hostile to officers who are African American.

167.    Defendant's EEO Director, Alphonso Lee, either directed or permitted, confidential statements made by Plaintiff when she went to the EEO department to complain of racial discrimination, to be leaked to Plaintiff's co-workers and supervisors.

168.    Defendant permitted or encouraged these leaks for the express purpose of turning Plaintiff's co-workers against her, and to treat her with contempt and disdain, because of her race.

169.    Defendant nurtured and tolerated a work environment in which negative comments and disparate treatment of African American officers was tolerated and accepted.

170.    Defendant subjected Plaintiff to constant denigrating comments, overly harsh discipline for picayune transgressions that other non-African American officers were not disciplined for, repeated relegation to undesirable assignments, repeated denials of job and promotional

opportunities, repeated disregard for Plaintiff's physical safety and well-being, and false and inaccurate evaluation of her performance, such pattern creating a hostile work environment for Plaintiff on the basis of her race.

171.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms that required her to seek professional treatment, and that materially caused her severe mental anguish.

172.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## COUNT III – Retaliation for Complaining of Race Discrimination

173.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

174.    As outlined in the facts above, on several occasions Plaintiff went to Defendant's EEO Office to complain of being discriminated against on the basis of her race.

175.    As outlined in the facts above, Plaintiff sought out and spoke with senior management and leaders of the SOD Department to complain about the racial discrimination and disparate treatment directed at her.   After her complaint, the discriminatory treatment against her escalated, in retaliation for engagement in statutorily protected activity.

176.    Plaintiff went to the Chief of Police and others to complain about the hostile work environment, disparate treatment, and retaliatory discipline she was being subject to because of her race, such communication constituting a protected activity.

177.    Plaintiff filed a formal OHR complaint alleging race discrimination against the MPD.  In doing so, Plaintiff engaged in statutorily protected activity.

178.    As a direct response to Plaintiff's engagement in protected activity, Defendant's retaliation against her escalated and increased.

179.    Ultimately, Plaintiff was forced to take retirement, rather than endure yet another punitive job transfer that was motivated by an intent to retaliate against her for engaging in protected activity.

180.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

181.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

182.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### Claims Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and Under the District of Columbia Human Rights Act District of Columbia Code § 2-1401.01 *et seq.* (Employment Discrimination on the Basis of Sex)

### COUNT IV – Disparate Treatment on the Basis of Sex (Female)

183.    Plaintiff restates and incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

184.    Plaintiff is a woman, and as such, is a member of a protected class.

185.    Plaintiff was treated differently and subjected to disparate and more harsh treatment in comparison to similarly situated male police officers.

186.    Plaintiff was disciplined for minor violations for which male officers were not disciplined.

187.    Plaintiff was given consistently undesirable assignments, rather than such assignments being spread equitably across her unit, and was chosen for those undesirable assignments on the basis of her sex. The disregard of Plaintiff's complaints and concerns, and the punishment handed down to her for minor transgressions was fundamentally unjust and was given to Plaintiff because of her sex.

188.    Plaintiff's performance evaluations were based on false and illegitimate disciplinary actions and were pretext to discriminate against Plaintiff on the basis of sex.

189.    Plaintiff was treated differently and subjected to different and more harsh terms and conditions of her employment due to her sex.

190.    Similarly situated male officers, were treated more favorably than Plaintiff with respect to terms and conditions of employment.

191.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her sex.

192.    As a direct and proximate cause of Defendant's conduct alleged in this Complaint, Plaintiff suffered, and continues to suffer mental and physical injury, and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, expenses, and costs – and is entitled to all available legal and equitable remedies.

193.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

194.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

195.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### COUNT V – Hostile Work Environment on the Basis of Sex

196.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

197.    Defendant has fostered and permitted to flourish a work climate and culture that is hostile to female officers.

198.    Defendant's EEO Director, Alphonso Lee, either directed or permitted, confidential statements made by Plaintiff when she went to the EEO department to complain of sex discrimination, to be leaked to Plaintiff's co-workers and supervisors.

199.    Defendant permitted or encouraged these leaks for the express purpose of turning Plaintiff's co-workers against her, and to treat her with contempt and disdain, because of her sex.

200.    Defendant nurtured and tolerated a work environment in which negative comments and disparate treatment of female officers was tolerated and accepted.

201.    Defendant subjected Plaintiff to constant denigrating comments, overly harsh discipline for picayune transgressions that male officers were not disciplined for, repeated relegation to undesirable assignments, repeated denial of job and promotional opportunities, repeated disregard for Plaintiff's physical safety and well-being, and false and inaccurate evaluation of her performance, such pattern creating a hostile work environment for Plaintiff on the basis of her sex.

202.    As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

203.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### COUNT VI – Retaliation for Complaining of Sex Discrimination

204.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

205.    As outlined in the facts above, Plaintiff went to Defendant's EEO Office to complain of being discriminated against on the basis of her sex. The EEO Director leaked her comments to others to isolate Plaintiff and invite retaliation against her.

206.    As outlined in the facts above, Plaintiff sought out and spoke with senior management and leaders of the SOD Department to complain about the sex discrimination and disparate treatment directed at her.   After her complaint, the discriminatory treatment against her escalated, in retaliation for engagement in statutorily protected activity.

207.    Plaintiff went to the Chief of Police and others to complain about the hostile work environment, disparate treatment, and retaliatory discipline she was being subject to because of her sex, such communication constituting a statutorily protected activity.

208.    Plaintiff filed a formal OHR alleging sex discrimination against the MPD.  In doing so, Plaintiff engaged in statutorily protected activity.

209.    In response to this statutorily protected activity, Plaintiff was wrongfully disciplined for something that is not unlawful.

210.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

211.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

212.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

**Claims Under the Civil Rights Act of 1866**
**Discrimination Based on Race in the Makin and Enforcing of Contracts**
**42 U.S.C. §1981(a) by way of, through and via 42 U.S.C. § 1983**

**COUNT VII – Disparate Treatment on the Basis of Race**

213.    Plaintiff restates and incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

214.    Plaintiff is African American, and as such, is a member of a protected class.

215.    Plaintiff was treated differently and subjected to disparate and more harsh treatment in comparison to similarly situated non-African American police officers.

216.    Plaintiff was disciplined for minor violations for which other non-African American officers were not disciplined.

217.    Plaintiff was given consistently undesirable assignments, rather than such assignments being spread equitably across her unit, and was chosen for those undesirable assignments on the basis of her race.

218.    Plaintiff was systematically denied job opportunities and promotional opportunities because of her race.

219.    Plaintiff's performance evaluations were based on false and illegitimate disciplinary actions and were pretext to discriminate against Plaintiff on the basis of race.

220.    Plaintiff was treated differently and subjected to different and more harsh terms and conditions of her employment due to her race.

221.    Similarly situated officers who were not black, have been treated more favorably than Plaintiff in the terms and conditions of employment.

222.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race.

223.    As a direct and proximate cause of Defendant's conduct alleged in this Complaint, Plaintiff suffered, and continues to suffer mental and physical injury, and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, expenses, and costs – and is entitled to all available legal and equitable remedies.

224.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

225.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

226.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### COUNT VIII – Hostile Work Environment on the Basis of Race

227.    Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

228.    Defendant has fostered and permitted to flourish a work climate and culture that is hostile to officers who are African American.

229.     Defendant's EEO Director, Alphonso Lee, either directed or permitted, confidential statements made by Plaintiff when she went to the EEO department to complain of racial discrimination, to be leaked to Plaintiff's co-workers and supervisors.

230.     Defendant permitted or encouraged these leaks for the express purpose of turning Plaintiff's co-workers against her, and to treat her with contempt and disdain, because of her race.

231.     Defendant nurtured and tolerated a work environment in which negative comments and disparate treatment of African American Officers was tolerated and accepted.

232.     Defendant subjected Plaintiff to constant denigrating comments, overly harsh discipline for picayune transgressions that other non-African American officers were not disciplined for, repeated relegation to undesirable assignments, repeated disregard for Plaintiff's physical safety and well-being, and false and inaccurate evaluation of her performance, such pattern creating a hostile work environment for Plaintiff on the basis of her race.

233.     As a direct and proximate cause of the hostile work environment fostered by Defendant, Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

234.     Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

### COUNT IX – Retaliation for Complaining of Race Discrimination

235.     Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

236.     As outlined in the facts above, Plaintiff went to Defendant's EEO Office to complain of being discriminated against on the basis of her race.  Instead of taking her complaints seriously,

the EEO Director leaked her statements to her colleagues in order to isolate her and invite retaliation and bullying of Plaintiff.

237.    As outlined in the facts above, Plaintiff sought out and spoke with senior management and leaders of the SOP Department to complain about the racial discrimination and disparate treatment directed at her.   After her complaint, the discriminatory treatment against her escalated, in retaliation for engagement in statutorily protected activity.

238.    Plaintiff went to the Chief of Police and others to complain about the hostile work environment, disparate treatment, and retaliatory discipline she was being subject to because of her race, such communication constituting a protected activity.

239.    Plaintiff filed a formal OHR charge alleging race discrimination against the MPD.  In doing so, Plaintiff engaged in statutorily protected activity.

240.    In response to Plaintiff's protected activity, Defendant engaged in a campaign to isolate and intimidate her, and disciplined her unfairly.

241.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

242.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

243.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

**Claim Under the District of Columbia
Whistleblower Protection Act
D.C. Code § 1-615-51 *et seq.***

**COUNT XII -- Whistleblower Retaliation**

244.   Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

245.   Pursuant to the D.C. Whistleblower Protection Act, Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

246.   Plaintiff is an employee who, as a result of her disclosures to her supervisors, the senior leadership of her department, OHR, the Mayor's Office and the DC City Council, revealed systemic discrimination in the MPD, and the complicity of the MPD EEO Department in perpetuating it and protecting those who engage in it, ethical violations that included leaking confidential witness statements, the creation of a chilling and retaliatory work culture that discouraged officers from complaining about mistreatment and inappropriate police conduct, enjoyed the protection of DCWPA.

247.   Plaintiff also testified before the City Council about incidents of leaders withing MPD falsifying records to manipulate the crime statistics reported for their district, such actions being a serious violation of the law.

248.   During her testimony, Plaintiff was asked if she was being retaliated against, and she stated that she was.

249.    The City Council took no action to protect Plaintiff from retaliation for engaging in protected activity.

250.    As a direct result of Plaintiff's protected disclosures, Defendant gradually, and continuously, retaliated against Plaintiff, including but not limited to unwarranted disciplinary actions against Plaintiff, isolation and separation from coworkers, unfavorable treatment and assignments, false and inaccurate performance evaluation, and harsh and unwarranted discipline.

251.    As a result of Defendant's actions, Plaintiff suffered significant economic harm in the form of loss of employment having to retire early, corresponding loss of income, loss of development opportunities, damage to her professional reputation, and significant mental and emotional distress.

252.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

253.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all the other losses stated herein.

254.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

**Claim Under the District of Columbia Common Law**

**COUNT XIII -- Negligent Supervision**

**(Failure to Train, Supervise and Discipline Officers
Responsible for Continuous Violations
of Plaintiff's Civil and Constitutional Rights)**

255.   Plaintiff incorporates and restates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

256.   On multiple occasions during her tenure at MPD, Plaintiff was subjected to false accusations, unfair and disparate treatment and discipline, unfair and unjustified changes to job assignments and duties, retaliatory investigations and other violations of her civil and constitutional rights.

257.   Defendant fostered a culture and environment where such violations were not only allowed to occur, but were encouraged and fully tolerated.

258.   On multiple occasions, Plaintiff complained of this systemic violation of her civil and constitutional rights, going up her chain of command, all the way to the Chief of Police, the Mayor and City Council.

259.   None of the entities to which Plaintiff complained took any action to address the continuous violation of Plaintiff's civil and constitutional rights.

260.   Plaintiff asserts that the District of Columbia owed her a duty of proper supervision of its MPD leadership, and that it had a responsibility to investigate and properly respond to her claims and concerns, which it, on multiple occasions, failed to do.

261.   On multiple occasions, when it became clear that a member of the MPD made false or salacious accusations against Plaintiff, defendant failed to properly discipline those persons,

allowing them to remain in positions of power, and to continue to engage in violations of Plaintiff's civil and constitutional rights.

262.    On multiple occasions, when it became clear that a member of the MPD had engaged in unlawful retaliation against Plaintiff for engaging in constitutionally protected activity, Defendant failed to intercede, take appropriated remedial action, or admonish or discipline such persons.

263.    Plaintiff asserts that Defendant owed her a duty, and had a responsibility to properly supervise MPD leadership and officers, and that it failed to do so when it failed to hold persons accountable for retaliating against Plaintiff for engaging in constitutionally protected activity.

264.    As a direct and proximate cause of Defendants' negligence, Plaintiff suffered significant economic harm in the form of loss of employment, corresponding salary, loss of employment opportunities, damage to her professional reputation, and significant mental and emotional distress.

265.    Plaintiff was humiliated, embarrassed and made to endure constant stress and anxiety, depression, lack of sleep and other symptoms of severe mental anguish.

266.    Plaintiff herein seeks compensatory and punitive money damages, and damages for mental pain and suffering of not less than $250,000, plus interest, costs, fees and all other remedies the Court deems appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court:

a.   Provide Plaintiff with applicable backpay, lost wages due to wrongfully denied job opportunities and an unfair failure to promote, benefits and interest;

b. Provide Plaintiff with a clean record devoid of any adverse/negative personnel actions/records, including all adverse/negative performance appraisals, disciplinary records, and substitute accurate agency records on the Plaintiff;

c. Reimburse Plaintiff for all sick leave she was forced to use due to the Defendant's discrimination and retaliation;

d. Award Plaintiff past pecuniary compensatory damages in their proven amount;

e. Award Plaintiff future pecuniary and nonpecuniary compensatory damages in a proven amount not to exceed lawful amounts provided by law.

f. Award Plaintiff punitive damages as decided by the Court;

g. Award Plaintiff reasonable attorney's fees and costs;

h. Award such other and further relief as this Honorable Court deems just and proper.

## **EQUITABLE RELIEF**

190. Plaintiff hereby incorporates by reference hereto, the facts, law, and/or allegations contained within the preceding paragraphs, as fully set forth herein.

191. Because of the actions alleged herein, the continued employment of the supervisors at issue herein without training in equal employment opportunity law, rules, and regulations, present a clear and present danger to the employees of Defendant and could result in further illegal actions on the part of Defendant, by and through their respective agents, servants, and employees.

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a. Order Defendant to institute a policy and procedure to be implemented against discrimination, retaliation, and hostile work environments.

b. Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein.

34

c.   Supervisory training for the supervisors at issue herein; and

d.   Such other and further relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Donald M. Temple*
Donald M. Temple, Esq.
Pamela M. Keith, Esq.
Temple Law Offices
1310 L St. NW
Suite 750
Washington, DC 20005
Dtemplelaw@gmail.com
pamkeithtemplelaw@gmail.com
202-628-1101 (o)
202-302-0383 (m)
*Counsel for Plaintiff*